# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IBEW LOCAL UNION 481 DEFINED CONTRIBUTION PLAN AND TRUST, Derivatively on Behalf of GODADDY, INC., | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0497-JTL |
| | ) | |
| RAYMOND E. WINBORNE, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| GODADDY, INC., | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## OPINION DENYING MOTION TO DISMISS

Date Submitted: May 24, 2023
Date Decided: August 24, 2023

Joel Friedlander, Jeffrey M. Gorris, Christopher M. Foulds, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; Randall J. Baron, Benny C. Goodman III, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Gladriel Shobe, Jarrod Shobe, SHOBE & SHOBE LLP, Provo, Utah; *Counsel for Plaintiff.*

S. Mark Hurd, Alexandra M. Cumings, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Jordan Eth, Philip T. Besirof, David J. Wiener, MORRISON & FOERSTER LLP, San Francisco, California; *Counsel for Defendants and Nominal Defendant*.

**LASTER, V.C.**

The defendants paid $850 million to settle a liability that the company contemporaneously valued on its audited financial statements at $175.3 million. The plaintiff contends that the directors breached their fiduciary duties by approving the payment in bad faith. They contend that the company's chief financial officer provided the directors with manufactured financial information to support their decision. They also say that the payment constituted waste.

Those claims are derivative, and the defendants moved to dismiss the complaint under Rule 23.1. That motion is denied. A majority of the directors who would consider the demand are defendants on the merits, and the complaint alleges particularized facts that collectively support a pleading-stage inference that the directors approved the payment in bad faith. That inference both rebuts the business judgment rule and renders exculpation unavailable, resulting in those directors facing a substantial risk of liability and rendering demand futile.

The defendant directors also moved to dismiss the claims under Rule 12(b)(6). The standard for pleading a claim that gives rise to a substantial threat of liability is higher than the standard for pleading a reasonably conceivable claim, so the former analysis dictates the outcome of the latter motion.

# I. FACTUAL BACKGROUND

The facts are drawn from the operative complaint, the documents it incorporates by reference, and public documents that are subject to judicial notice.[1] At this stage of the proceedings, the complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences.

## A. The Up-C IPO And The Tax Agreements

GoDaddy Inc. ("GoDaddy" or the "Company") is a Delaware corporation headquartered in Tempe, Arizona. It provides web hosting, Internet domain registration, and other cloud-based services.

Robert Parsons founded GoDaddy's predecessor in 1997. In 2011, Parsons sold a majority of his equity stake, representing a controlling interest in GoDaddy, to Kohlberg Kravis Roberts & Co. L.P. ("KKR"), Silver Lake Partners ("Silver Lake"), and Technology Crossover Ventures ("TCV").

In 2015, GoDaddy completed an Up-C IPO. That chimeric structure layers a parent-level corporation on top of a limited liability company that is treated as a partnership for tax purposes. The member interest in the LLC is divided into a number of units. The

---

[1] The operative complaint is the plaintiff's amended complaint, filed on November 4, 2022. Dkt. 16. Citations in the form "Compl. ¶ —" refer to the paragraphs of the complaint. The complaint did not attach any exhibits, but it incorporated by reference documents that the plaintiff obtained using Section 220 of the General Corporation Law. The parties submitted those documents by affidavit. Citations in the form "DX [number] at —" refer to exhibits that the defendants submitted. *See* Dkts. 22, 28. Citations in the form "PX [number] at —" refer to exhibits that the plaintiff submitted. *See* Dkt. 24.

corporation owns some, but not all, of the units. The insiders taking the company public own the remaining units.

The parent-level corporation issues two classes of stock. Class A stock is straight common stock, and each share carries voting rights and reflects a proportionate economic ownership interest in the corporation. Class B stock is special stock. It only carries voting rights. The Class B stock does not reflect any economic ownership in the corporation.

In the Up-C IPO, public investors receive Class A shares. Insiders receive Class B shares. The number of units in the LLC is adjusted to match the number of outstanding shares.

The result is a hybrid entity in which public stockholders participate in governance and economically through their Class A shares. The insiders participate in governance through their Class B shares and economically through their LLC units. The combination allows insiders to take a company public while retaining the benefit of pass-through tax treatment. They also get the benefit of liquidity, because the transaction documents authorize an insider to convert one Class B share plus one LLC unit into one Class A share, which can then be sold.

In the Company's version of the Up-C structure, GoDaddy was the holding company. An entity named Desert Newco, LLC was the LLC. GoDaddy's public stockholders received Class A shares. Parsons, the private equity investors, and various pre-IPO senior officers and stockholders (together, the "Founding Investors") received Class B shares and Desert Newco units. Consistent with the Up-C structure, the Founding

3

Investors could convert one Class B share plus one Desert Newco unit into one Class A share.

Immediately before the IPO, GoDaddy and the Founding Investors entered into tax revenue agreements (the "Tax Agreements" or "TRAs"). They provide that if GoDaddy reduces its taxable income by using a tax asset generated by a Founding Investor, then GoDaddy must pay the Founding Investor 85% of the savings. GoDaddy has no obligation to make any payment to a Founding Investor unless and until GoDaddy uses the tax asset to generate savings.

The principal tax asset that a Founding Investor might create would result if a Founding Investor exercised its conversion right and sold the resulting Class A share for more than the IPO price. That sale would result in a proportionate step up in the tax basis of GoDaddy's assets, and GoDaddy could claim depreciation on the increased value to reduce its taxable income. If GoDaddy lacked sufficient taxable income to use the tax asset in a given year, it could carry the asset forward to a later year, creating a deferred tax asset (sometimes abbreviated "DTA") that GoDaddy could use once it had taxable income.

**B.    The Founding Investors Sell Their Equity Stakes.**

By February 2019, Parsons and the three private equity investors had fully exited from their equity positions, generating tax assets with a total value of $2.2 billion (the "Tax Asset"). GoDaddy's commitment to pay 85% of that benefit to the Founding Investors resulted in a nominal liability of approximately $1.8 billion (the "Nominal Liability").

4

Despite the size of the Nominal Liability, GoDaddy had not made any payments under the Tax Agreements because GoDaddy did not generate taxable income. GoDaddy also had little prospect of generating taxable income. Its business model relied heavily on mergers and acquisitions, which create tax benefits of their own. In the four years since its IPO, GoDaddy completed acquisitions valued at over $2 billion. GoDaddy had every intention of continuing that business strategy.

GoDaddy's strategy of growth by acquisition reduced the likelihood that GoDaddy would be able to use the Tax Asset and have to make payments to the Founding Investors. Since the IPO, GoDaddy had repeatedly pushed out the date when it expected to begin making payments under the Tax Agreements. In 2016, the start date was expected to be 2017. At the beginning of 2019, the start date was 2021. During 2019, it was pushed back to 2022. And once the payments began, they would be spread out over fifteen years.

For the private equity investors, the right to receive a stream of future payments beginning at some indefinite point in the future and extending over a decade and a half was not an attractive asset. The private equity firms invested in GoDaddy through funds formed in 2006 and 2007. By 2019, those funds had grown stale. It is reasonable to infer that the private equity investors wanted to convert their rights under the Tax Agreements from a speculative long-term revenue stream into cash so that they could liquidate their aging funds and return capital to their investors.

Although the private equity investors had sold off their shares in the Company, Silver Lake and KKR still had influence on the nine-member board of directors (the

5

"Board"). Silver Lake had two designees: Lee Wittlinger, a managing director of Silver Lake, and Gregory Mondre, Silver Lake's co-CEO. KKR had one designee—Herbert Chen—who had worked for KKR from 1995 to 1997 and again from 2007 to 2019. Chen was personally entitled to payments from the Tax Agreements.

The other six members of the Board were Amanpal Bhutani, Charles Robel, Brian Sharples, Mark Garrett, Caroline Donahue, and Ryan Roslansky. Robel served as Board Chair, and Bhutani served as the Company's Chief Executive Officer.

## C.    The December 2019 Meeting

During a meeting of the Board in December 2019, GoDaddy's Chief Financial Officer Raymond Winborne gave a standard presentation about the Company's financial performance. The thirty-sixth page of the presentation was titled "Capital structure | Capacity and Liquidity." DX 2 at '254. The first comment on that page stated: "Cash and short-term investments at $1.8B+ by end of 2020 brings net leverage ratio under 1X. Excess liquidity growing to $3B+ at year end 2020 (4x leverage cap)." *Id*. The next comment stated: "M&A/share repurchases remain capital allocation priorities" and that "TRA payments (~$1.8B gross) start in ~2022 at <$100M; expected to be in the $225M range in 2023+." *Id.*

The presentation did not refer to using capital to acquire the Founding Investors' rights to payments under the Tax Agreements (a "TRA Buyout"). Nor do the minutes reflect any discussion of a TRA Buyout. *See* PX 3.

6

**D.      The Formation Of The Special Committee**

After the start of the New Year, Nima Kelly, GoDaddy's General Counsel, circulated an email asking the directors to execute a unanimous written consent that would establish a special committee to consider and negotiate the terms of a possible TRA Buyout (the "Special Committee"). DX 3 at '454–55. Kelly was a Founding Investor who would benefit personally from a TRA Buyout.

The Board approved the written consent in the form circulated by Kelly. The record does not reflect any prior discussion about a TRA Buyout, the concept of the Special Committee, or who would serve as its members.

A recital in the written consent asserted that the Board "has discussed the possibility of [a TRA Buyout]" during its meeting on December 4, 2019. *Id.* To reiterate, the minutes of the December meeting do not reflect that.

A second recital to the written consent stated that the Special Committee was being created because "certain members of the Board and of management of the Company are affiliated with the holders of the TRAs or are party to the TRAs" and the Special Committee would "mitigate and address conflicts of interest in connection with the foregoing process and any transaction resulting therefrom." *Id.* at '455

The empowering resolution delegated to the Special Committee "the exclusive power and authority" to take a list of actions "in its sole and absolute discretion." *Id.* The list of actions included:

7

- "To consider and evaluate the TRA Buyout and any potential alternatives to the TRA Buyout";

- "To review, evaluate, investigate, pursue and negotiate the terms and conditions of the TRA Buyout or any potential alternatives to the TRA Buyout";

- "To determine whether the TRA Buyout or any potential alternatives …. are advisable and fair to, and in the best interests of, the Company and its stockholders"; and

- "To authorize and approve, or in the discretion of the Special Committee to make a recommendation to the Board regarding the authorization and approval of the TRA Buyout or any potential alternatives to the TRA Buyout."

*Id.* The resolution provided that the Board would not authorize, approve, or effectuate a TRA Buyout without an affirmative recommendation from the Special Committee. *Id.* at '455–56.

There were five directors who were neither affiliated with Founding Investors nor a member of management: Robel, Sharples, Garrett, Donahue, and Roslansky. Two of those directors—Donahue and Roslansky—had no apparent ties whatsoever to the Founding Investors. But the written consent did not name either as a member of the Special Committee.

The written consent designated Robel, Sharples, and Garrett as the members of the Special Committee. Of the five candidates, they were the three with the closest ties to the Founding Investors.

Robel had served on the Board since before the Up-C IPO. He was thus a Founding Investor himself and would benefit from the TRA Buyout. So that he could serve on the Special Committee, he renounced his rights under the Tax Agreements.

8

Contemporaneously, Robel was approached by Richard Kimball, a former GoDaddy director and the founder and general partner of TCV, about coinvesting with TCV in Sportradar AG, a multinational company that provides data collection and analytical services to sports betting organizations, and serving on its board. Robel committed to invest $400,000 in Sportradar and believed he could earn "a return on his investment that, depending on the company's performance, could be material to his individual net wealth." DX 7 at '007.

Sharples joined the Board in 2016, after the Up-C IPO. Over the years, Sharples enjoyed a profitable relationship with TCV. He co-founded HomeAway, Inc., a vacation rental marketplace, in 2004. In 2008, TCV invested $250 million in HomeAway and placed two of its representatives on the board. Sharples described the transaction as joining forces with TCV, and TCV began referring to HomeAway as one of its portfolio companies. In a prospectus for a SPAC that Sharples filed in March 2021, he touted his relationship with TCV and other private equity funds.

Garrett joined the Board in 2018, after the Up-C IPO. He also had some overlapping connections with Silver Lake and KKR. None of his ties appear significant, but unlike Donahue and Roslansky, he had them.

### E. The Special Committee's First Meeting

The Special Committee met for the first time on January 24, 2020. Winborne attended, as did a representative of the Company's in-house legal department and a lawyer

9

from the Company's outside counsel. Representatives of Potter Anderson & Corroon and KPMG LLP joined the meeting.

The purpose of the meeting was to consider retaining Potter Anderson and KPMG. Potter Anderson would serve as legal counsel. KPMG would "provide a valuation report that would set forth the range of values within which KPMG believed a settlement of the TRAs would be expected to fall." DX 4 at '002.

The minutes do not reflect the Special Committee considering any other firms. At this stage, it is reasonable to infer Potter Anderson and KPMG where the only legal and financial advisors that the Special Committee considered. It seems as if someone had already lined them up for the Special Committee to use.

Both Potter Anderson and KPMG had concurrent representations of KKR. Potter Anderson disclosed its conflict. KPMG did not. *See* Compl. ¶ 124.

The Special Committee approved the retention of both advisors and instructed them to start analyzing a potential TRA Buyout.

F.     **The Special Committee's Second Meeting**

On February 7, 2020, the Special Committee held its second meeting. Winborne was there, along with other members of management, an in-house attorney, and two attorneys from the Company's outside counsel. A team from Potter Anderson and KPMG also attended. DX 7.

Winborne started the meeting by providing "an overview of the rational for" the TRA Buyout, which management called "Project Exodus." *Id.* at '003 & '010. He cited

10

"certain business and investor concerns related to the TRAs' impact on the Company's pro forma business and market trading price." *Id.* at '003. He noted that the Company had "a number of strategic initiatives" that it could pursue but asserted that "there was considerable value for the Company in exploring a buyout of the TRAs at this time." *Id.*

Winborne walked thorough a presentation that included a base case financial model. *Id.* at '004. One of the Committee members asked if the projections included growth initiatives, which inferably would include future acquisitions. Winborne said they did not. *Id.*; *see id.* at '014. That was a key omission, because the Company's M&A-based business model generated tax attributes that limited its ability to use the Tax Asset.

Winborne's model assumed that GoDaddy would begin to use the Tax Asset and make payments under the Tax Agreements in 2022, with utilization jumping in 2023. *Id.* at '031. He projected that the Company would pay over half of the Nominal Liability by fiscal year 2027. *Id.* at '006, '031.

To value the TRA Buyout from the Company's perspective, Winborne modeled the transaction as a purchase of tax assets owned by the Founding Investors. *See id.* at '021. That perspective allowed him to start with Tax Asset's gross value of approximately $1.8 billion, treat the purchase of 85% of the Tax Asset as "[l]iability avoidance" in the amount of $1.3 billion, then add the deductible portion of the buyout price for another $158 million in value, resulting in a total benefit to the Company of $1.472 million. *Id.* He then discounted that figure back to present value using a discount rate of 7.8%, which reflected

11

his calculation of GoDaddy's weighted average cost of capital ("WACC"). Winborne calculated a net present value for the payments of $904 million. *Id.* at '023.

Winborne suggested that the private equity investors would use higher discount rates of 15% to 20%. Discounting the Nominal Liability at those rates resulted in a present value of approximately $700 million. *See id.* at '012. Winborne thought that the $200 million difference created "space for a mutually agreeable range for settlement." *Id.* He suggested a deal that "splits the difference" and paid the Founding Investors approximately $800 million. *Id.* at '012, '034. He argued that paying the Founding Investors compared favorably to share repurchases or M&A of the same magnitude. *Id.* at '029.

The minutes recite that after Winborne's presentation, "[a] discussion ensued regarding the anticipated timing for the first payments by the Company under the TRAs, as well as the total amounts to be paid under the TRAs, *assuming all TRA attributes were utilized by the Company.*" *Id.* at '004 (emphasis added). That assumption put the rabbit in the hat because a key driver of whether the Company would need to make any payments under the TRAs was whether and when the Company utilized the Tax Asset.

After discussing the accounting treatment for a TRA Buyout, KPMG left the meeting. Potter Anderson then made clear that KPMG would *not* be providing a fairness opinion, only a valuation report containing financial analysis. DX 7 at '006. The Special Committee decided it would be "comfortable relying on KPMG's valuation report and

12

Management's financial analysis" and would not retain a financial advisor to render a fairness opinion. *Id.*

At this point in the meeting, Robel disclosed TCV's offer to serve on the board of Sportsradar and co-invest in the company. He explained that he planned to invest $400,000 and that the anticipated upside "could be material to his individual net worth." *Id.* at '007. Robel left the meeting. Garrett and Sharples discussed the conflict. The minutes redact the conclusions they drew, but it seems evident from Robel's continued attendance and participation at Special Committee meetings that they decided Robel should continue to serve. *See id.*

Robel was serving as Chair of the Special Committee. As a result of TCV's offer, he also had the most obvious tie to a Founding Investor. TCV would receive 11% of the proceeds from a TRA Buyout.

## G.    The Board Gets A New Member.

On February 10, 2020, only three days after Robel disclosed his coinvestment with TCV, the Company announced that Mondre, Silver Lake's co-CEO, had resigned from the Board. He was replaced by Leah Sweet, an outsider with no apparent connections to the Founding Investors.

The pleading-stage record does not reveal why Mondre left. Regardless of the reason, replacing him with Sweet opened the door to a legal argument that the nine-member Board had a majority of independent directors. Even without Robel and Sharples (and

13

counting out Wittlinger and Chen), there remained five other directors: Garrett, Donahue, Roslansky, Sweet, and Bhutani.

## H.    The Special Committee's Third Meeting

On February 14, 2020, the Special Committee met for a third time. The same basic group attended. The principal purpose of the meeting was to review KPMG's preliminary valuation analysis. DX 8 at '044.

KPMG valued the amounts due under the Tax Agreements from GoDaddy's perspective as having a net present value of $869.7 million to $1.1994 billion. PX 7 at '059. KPMG derived these amounts by starting with the full value of the Nominal Liability. To derive a discount rate, KPMG analogized the Founding Investors rights to payments under the Tax Agreements to a subordinated, illiquid debt instrument, then calculated a range of discount rates by looking to the implied yield of GoDaddy's 2027 Notes. *Id.* at '063. KPMG's alternative methodology derived a discount rate for the TRA Liability of 9.5% by starting with GoDaddy's calculated WACC of 8.5% then adding an illiquidity premium of 1%. *Id.* at '064.

KPMG's analysis identified five precedent settlements of TRA liabilities. PX 7 at '068. KPMG reported that settlements ranged in value from 39.4% to 60.6% of the gross value of the tax asset. *Id.* KPMG cautioned that each settlement involved fact-specific considerations.

The Special Committee and management discussed strategy for negotiating with the private equity firms. Management—inferably Winborne—noted that there was already

14

"alignment with KKR." DX 8 at '055. Winborne suggested that he meet with KKR and Silver Lake the following week to begin negotiations. The Special Committee directed Winborne to tell Silver Lake and KKR that the Company would not agree to a discount rate below GoDaddy's WACC. DX 8 at '045–46.

## I.     The 2019 10-K

While the Special Committee was meeting, GoDaddy was finalizing its Form 10-K for the year ended December 31, 2019. Under generally accepted accounting principles ("GAAP"), GoDaddy was required to record a liability for the probable amount of the future payments that GoDaddy actually would have to make under the Tax Agreements (the "TRA Liability"). The magnitude of the TRA Liability was thus not the same as the gross value of the Tax Asset or the Nominal Liability. The TRA Liability had to take into account whether it was probable that GoDaddy would be able to use the Tax Asset, which was the trigger for making a payment under the TRA Agreements. Neither the Tax Asset nor the Nominal Liability reflected that critical consideration.

Winborne led the team that calculated the TRA Liability. Ernst & Young LLP, GoDaddy's auditors, reviewed and signed off on the calculation. GoDaddy's Audit and Finance Committee (the "Audit Committee") met quarterly with Winborne and Ernst & Young to review and approve the Company's financial statements, including the TRA Liability.

Throughout 2019, management, Ernst & Young, and the Audit Committee had examined the TRA Liability. In April 2019, Ernst & Young told the Audit Committee that

15

the TRA Liability was one of its "Areas of Emphasis." PX 2 at '852. In November 2019, Ernst & Young identified the TRA Liability as one of two "Critical Audit Matters." PX 1 at '167. That meant that the TRA Liability would be "an area of focus in our audit as well as a focus by our audit executives." *Id.*

In November 2019, management valued the TRA Liability at "~175 million." PX 1 at '151. Management provided the following explanation for the Audit Committee:

> We have determined it is more-likely-than-not we will be unable to utilize all of the DTAs subject to the TRAs; therefore, we have not recorded a liability related to the tax savings we may realize from the utilization of NOL carryforwards and the amortization related to basis adjustments created by exchanges of units. If utilization of these DTAs becomes more likely-than-not in the future, at such time, we will record TRA liabilities of up to an additional ~$1.15B as a result of basis adjustments under the Internal Revenue Code and up to an additional ~436M related to the utilization of NOL and credit carryforwards, which will be recorded through charges to our statements of operations.

*Id.* In other words, the Nominal Liability may have been approximately $1.8 billion, but the TRA Liability was much less.

On February 20, 2020, GoDaddy filed its 2019 10-K, which included its audited financial statements. Every director signed the filing, as did Winborne as CFO.

The audited financial statements recorded a value of $175.3 million for the TRA Liability as of December 31, 2019. DX 5 at 49. The disclosure regarding the magnitude of the TRA Liability stated:

> As of December 31, 2019, we have recorded a liability under the TRAs of $175.3 million payable to certain pre-IPO owners. This is the amount of liability we currently deem probable and estimable, which takes into account limitations on our use of the favorable tax attributes due to limitations of

16

taxable income…. We have determined it is more-likely-than-not we will be unable to utilize all of our DTAs subject to the TRAs[.]

*Id.*

The audited financial statements acknowledged the magnitude of the Nominal Liability, but nevertheless valued the TRA Liability at $175.3 million. GoDaddy's audited financial statements did not project any payments to the Founding Investors in 2020, 2021, or 2022. The audited financial statements projected a payment of only $36.3 million in 2023 and only $139 million in total payments after that.

The representations that Winborne made to the Audit Committee and Ernst & Young and which appeared in the 2019 10-K were quite different from what Winborne told the Special Committee. When presenting to the Special Committee, Winborne claimed that the Company would begin making payments under the Tax Agreements in 2022, that the payments would ramp up in 2023, that the Company would pay over half of the Nominal Liability to the Founding Investors by fiscal year 2027, and that over the ensuing years the Company would generate so much taxable income that it would use the enter Tax Asset and be forced to pay the Nominal Liability in full. DX 7 at '006, '031.

Robel, Garrett, and Donahue served on the Audit Committee. Two of the three members of the Audit Committee (Robel and Garrett) thus also served on the Special

17

Committee and could bring information they learned as Audit Committee members to bear on the Special Committee's assignment.

## J. The Special Committee's Fourth Meeting

The Special Committee met again on February 24, 2020. The same basic group attended. The meeting took place just four days after all three members of the Special Committee signed the 2019 10-K containing the valuation of $175.3 million for the TRA Liability.

Winborne started the meeting by reporting on his discussions with Silver Lake and KKR. DX 9 at '130. According to the minutes, he said Silver Lake and KKR had proposed a discount rate using the Company's cost of debt, but he had "firmly pushed back" on that request. *Id.* at '131.

## K. The Special Committee's Fifth Meeting

The Special Committee met again on March 2, 2020. Sharples could not attend. Otherwise, the same basic group attended.

Winborne started the meeting by reporting on his discussions with Silver Lake and KKR, including a discussion of discount rates. DX 10 at '132. He reported that both sides had completed their due diligence and that he had a meeting scheduled for the next day with Silver Lake and KKR to continue discussions.

Winborne asked for formal authority to begin price negotiations with Silver Lake and KKR with an initial offer of $750 million. The Special Committee granted that request and authorized Winborne to negotiate up to $850 million. Winborne reported that

management hoped to announce an agreement before GoDaddy's investor day on April 2, 2020. *Id.* at '134.

**L.      Winborne's Pitch To The Private Equity Firms**

On March 9, 2020, Winborne met with the private equity firms and made an opening offer of $750 million. He framed the transaction as an acquisition of tax assets that they owned. PX 4 at '143.

In his presentation, Winborne told the private equity firms that the "timing [of payments] is relatively well-known as the result of GoDaddy's scaling income and caps on utilization." *Id.* at '144. Despite that "relatively well-known" timing, Winborne was saying different things to different people. For purposes of the Company's audited financial statements, he had told Ernst & Young and the Audit Committee that it was more likely than not that GoDaddy would not use all of the Tax Asset. For purposes of the Special Committee, he said that GoDaddy would use all of the Tax Asset. For purposes of his discussions with the private equity firms, he stated that "GoDaddy's TRA liabilities will create $1.8B of payments over 15+ years." *Id.*

**M.      The Board Update**

During a meeting of the Board on March 5, 2020, Winborne gave a detailed presentation that largely reiterated what he had been saying to the Special Committee. In his presentation, Winborne acknowledged that while "[t]he current undiscounted value of the liability is ~$1.8B," the "key variable is when (or if) you actually pay it out." DX 11 at '480. He noted that the present value of the liability depended on (i) "Trajectory/timing of

19

projected operating earnings," (ii) "Federal tax law (statutory rate, deductibility, limitations, etc.)," and (iii) "Discount rate." *Id.* Winborne then projected that GoDaddy would begin to use the Tax Asset in 2022, resulting in significant payments that began in that year, continued through 2030, then declining through 2036. *Id.* at '481. That was contrary to what was in the 2019 10-K that Winborne and the directors signed and filed two weeks before.

Winborne represented that based on the Company's "bottoms-up long-term financial model," there was a "high probability of using" the Tax Asset. *Id.* at '479. He reported that "our financial advisors have estimated the present value of the TRA to GoDaddy shareholders is within a range of ~$870 to $1,200M (v. $1.8bn undiscounted), reflecting a range of discount rates and probability weighting changes to future income tax rates." *Id.* He stated "[u]sing current tax rates and a discount rate of 7.8% (between debt and [] WACC) results in an NPV of ~$900M." *Id.* Winborne explained his view that the private equity firms would use higher discount rates, resulting in a likely difference of "~$200M in perceived fair value, creating space for a mutually agreeable range for settlement." *Id.*

## N.    The Covid-19 Pandemic

In mid-March 2020, the Covid-19 pandemic put the buyout talks on hold. Internet companies proved resilient, and by June 2020, GoDaddy's performance had rebounded. A presentation given to the Board during a meeting on June 3, 2020 noted that "Q2 results

20

will significantly beat consensus expectations for bookings (+4%) and uFCF (+12%) while revenue will meet consensus." DX 12 at '535.

During the June meeting, management noted that by the end of the third quarter, GoDaddy will have deployed "$415M for announced M&A." *Id.* at '543. Winborne's presentations on the TRA Buyout had again not included the effects of future M&A.

**O.     Winborne Agrees In Principal To The TRA Buyout.**

In June 2020, negotiation over the TRA Buyout resumed. On June 19, 2020, Winborne reported to the Special Committee that Silver Lake had countered at $850 million. That was at the top end of his authority, so from Winborne's perspective, they had a deal.

Winborne told the Special Committee that they needed "to move quickly" to lock in that price. DX 13 at '185. Winborne elaborated: "We are very likely at peak interest for liquidity w/r/t/ [the private equity investors] and the outcome of the presidential election also likely plays against us, so getting to an agreement quickly is to our benefit…." *Id.* at '189. That the private equity investors would be eager was understandable—they wanted to close out their funds. Winborne did not envision using the private equity investors' eagerness to GoDaddy's advantage. He wanted GoDaddy to operate on their schedule.

The Special Committee did as Winborne asked. They met formally on June 26, 2020, one week after his email. The usual crowd was there.

Winborne gave a presentation on what was now called "Project Leviticus." Throughout his analysis, Winborne treated the transaction as the purchase of an asset rather than a compromise of a liability. *E.g.*, DX 13 at '198, '202.

Winborne represented that the valuation of $850 million compared variably to management's valuation of $890 million. *Id.* at '189. He reported that the management intended to finance the TRA Buyout using $250 million of cash on hand plus another $600 million from new debt financing. *Id.* at '189, '202. Winborne thus was proposing to fund over two-thirds of the settlement of a contingent debt obligation that did not bear interest with interest-bearing debt.

The Special Committee discussed ,the Company's ability to…engage in the [TRA Buyout] and meet its ongoing financial obligations." *Id.* at '179. As part of that discussion, the Special Committee and management—inferably Winborne—discussed whether the Company "had sufficient funds to engage in certain additional strategic transactions over the next few years…." *Id.* at '180. The projections that Winborne had prepared to support the TRA Buyout, however, did not incorporate any additional strategic transactions.

Omitting those transactions made it appear more likely that GoDaddy would use the Tax Asset.

During the meeting, KPMG provided a draft of its valuation report. That report "estimate[d] the range of fair market values of the TRA as of the Valuation Date to be $951.2 to $1,147.8 million." Ex. 14 at '147.

**P.     The Special Committee Balks.**

The Board had created the Special Committee to make a decision about the TRA Buyout and empowered the Special Committee with its full power and authority for that purpose. To be sure, the empowering resolution authorized the Special Committee to refer the matter back to the Board with a recommendation from the Special Committee as to how to proceed, but the whole purpose of forming the Special Committee in the first place was to avoid conflicts of interest at the Board level.

At its final meeting on July 14, 2020, the Special Committee balked. Rather than making the decision itself, the Special Committee lateraled it back to the full Board.

On July 28, 2020, KPMG submitted its final valuation report. Based on its analysis, KPMG "estimate[d] the range of fair market values of the TRA as of the Valuation Date to be $1,070.7 to $1,373.1 million." DX 15 at '223.

**Q.     The Board Approves The TRA Buyout.**

On July 30, 2020, the Board met to consider the TRA Buyout. The two remaining directors affiliated with the Founding Investors—Wittlinger and Chen—did not attend.

Winborne discussed the terms and benefits of the TRA Buyout and presented

23

management's valuation.

KPMG was not present. Winborne summarized KPMG's report.

Robel provided an overview of the Special Committee's work. He recommended that the Board approve the TRA Buyout.

Robel, Sharples, Garrett, Sweet, Bhutani, Donahue, and Roslansky approved the TRA Buyout (the "Voting Directors"). The meeting took a total of thirty minutes.

Four days later, on August 3, 2020, the Audit Committee held its quarterly meeting. The materials showed that GoDaddy's audited projections for payments under the Tax Agreements in coming years had dropped significantly. DX 17 at '783.

On August 13, 2020, less than two weeks after she voted to approve the TRA Buyout, Sweet joined the board of directors of BMC Software, a KKR portfolio company where Chen served as Chairman. The pleading-stage record does not reveal whether that appointment was in the works before the vote, but it is reasonable to draw that inference at the pleading stage.

## R.    This Litigation

The plaintiff is a stockholder who sued to challenge the TRA Buyout. The complaint contains three counts.

Count I asserts that Winborne breached his fiduciary duties as CFO by "providing materially false, misleading and incomplete information to the Board, the Special Committee, and KPMG." Compl. ¶ 246.

Count II asserts that the members of the Board breached their fiduciary duties by approving the TRA Buyout and "knowingly causing GoDaddy to make a substantial overpayment to the Founding Investors in exchange for their interests in the TRAs for self-interested reasons and/or in bad faith." *Id.* ¶ 251.

Count III asserts that the TRA Buyout constituted waste. *Id.*

## II. LEGAL ANALYSIS

The defendants have moved to dismiss the complaint under Court of Chancery Rule 23.1 for failure to plead demand futility. In its entirety, Rule 23.1(a) states:

> In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall allege that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort.

The innocuous language of the second sentence supports the edifice of Rule 23.1 jurisprudence. *See Lebanon Cnty. Empls' Ret. Fund v. Collis*, 2022 WL 17841215, at *13 (Del. Ch. Dec. 22, 2022).

Rule 23.1's second sentence is the "procedural embodiment" of substantive principles of Delaware law. *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993). When a corporation suffers harm, the board of directors is the institutional actor legally empowered to determine what, if any, remedial action the corporation should take, including pursuing litigation against the individuals involved. *See* 8 *Del. C.* § 141(a). "A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984).[2] "Directors of Delaware corporations derive their managerial

---

[2] In *Brehm v. Eisner*, 746 A.2d 244, 253–54 (Del. 2000), the Delaware Supreme Court overruled seven precedents, including *Aronson* to the extent that they reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *Brehm*, 746 A.2d at 253 n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch.*, 701 A.2d 70, 72–73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984); and *Aronson*, 473 A.2d at 814). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. *Brehm*, 746 A.2d at 254. The seven partially overruled precedents otherwise remain good law. This decision does not rely on any of them for the standard of appellate review. Having described *Brehm*'s relationship to these cases, this decision omits their cumbersome subsequent history.

More recently, the Delaware Supreme Court overruled *Aronson* and *Rales*, to the extent that they set out alternative tests for demand futility. *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg* (*Zuckerberg II*), 262 A.3d 1034, 1059 (Del. 2021). The high court adopted a single, unified test for demand futility. Although the *Zuckerberg II* test displaced the prior tests, cases properly applying *Aronson* and *Rales* remain good law. *Id.* This decision therefore does not identify any precedents, including *Aronson* and *Rales*, as having been overruled by *Zuckerberg II*.

26

decision making power, which encompasses decisions whether to initiate, or refrain from entering, litigation, from 8 *Del. C.* § 141(a)." *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981) (footnote omitted). "The board's authority to govern corporate affairs extends to decisions about what remedial actions a corporation should take after being harmed, including whether the corporation should file a lawsuit against its directors, its officers, its controller, or an outsider." *Zuckerberg II*, 262 A.3d at 1047.

"In a derivative suit, a stockholder seeks to displace the board's decision-making authority over a litigation asset and assert the corporation's claim." *Id.* (cleaned up). Unless the board of directors permits the stockholder to proceed, a stockholder only can pursue a cause of action belonging to the corporation if (i) the stockholder demanded that the directors pursue the corporate claim and they wrongfully refused to do so, or (ii) demand is excused because the directors are incapable of making an impartial decision regarding the litigation. *Id.* "Thus, the demand-futility analysis provides an important doctrinal check that ensures the board is not improperly deprived of its decision-making authority, while at the same time leaving a path for stockholders to file a derivative action where there is reason to doubt that the board could bring its impartial business judgment to bear on a litigation demand." *Id.* at 1049.

Rule 23.1 imposes a pleading requirement so that demand principles can be applied at the outset of a case to determine whether the plaintiff has standing to sue. *See id.* at 1048. To satisfy the pleading requirements of Rule 23.1, the plaintiff "must comply with stringent requirements of factual particularity that differ substantially from . . . permissive notice

27

pleadings . . . ." *Brehm*, 746 A.2d at 254. Under the heightened pleading requirements of Rule 23.1, "conclusionary [sic] allegations of fact or law not supported by allegations of specific fact may not be taken as true." *Grobow*, 539 A.2d at 187.

The plaintiff in this case chose not to make a pre-suit demand. The question under Rule 23.1 is therefore whether demand is excused because there is a reasonable doubt that the directors could have properly responded to a demand. *Zuckerberg II*, 262 A.3d at 1049.

The reasonable doubt standard is intended to be "sufficiently flexible and workable to provide the stockholder with 'the keys to the courthouse' in an appropriate case where the claim is not based on mere suspicions or stated solely in conclusory terms." *Grimes*, 673 A.2d at 1217 (footnote omitted). The "reasonable doubt" standard is not intended to incorporate "a concept normally present in criminal prosecution." *Id.* at 1217. "Reasonable doubt can be said to mean that there is a reason to doubt." *Id.* "Stated obversely, the concept of reasonable doubt is akin to the concept that the stockholder has a 'reasonable belief' that the board lacks independence or that the transaction was not protected by the business judgment rule. The concept of reasonable belief is an objective test . . . .'" *Id.* at 1217 n.17.

As noted, a plaintiff must plead particularized facts sufficient to give rise to a reasonable doubt, but that does not mean that a plaintiff must "plead particularized facts sufficient to sustain 'a judicial finding'" that a director would be disabled from considering a demand. *Grobow*, 539 A.2d at 183. Rule 23.1 requires that a plaintiff allege specific facts, but "he need not plead evidence." *Aronson*, 473 A.2d at 816; *accord Brehm*, 746 A.2d at 254 ("[T]he pleader is not required to plead evidence."). Whether the pled facts could

28

support a "judicial finding" would impose "an excessive criterion" for applying Rule 23.1. *Grobow*, 539 A.2d at 183. The operative standard is the "reasonable doubt test." *Id.*

The particularized pleading standard also does not change the principle that the plaintiff receives the benefit of favorable inferences on a pleading-stage motion to dismiss. "When considering a motion to dismiss a complaint for failing to comply with Rule 23.1, the Court does not weigh the evidence, must accept as true all of the complaint's particularized and well-pleaded allegations, and must draw all reasonable inferences in the plaintiff's favor." *Zuckerberg II*, 262 A.3d at 1048. When determining whether a reasonable doubt exists, the trial court must "consider all the particularized facts pled by the plaintiffs . . . in their totality and not in isolation from each other." *Del. Cnty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015). Evaluating a board's ability to consider a demand impartially thus requires a "contextual inquiry." *Beam v. Stewart* (*Beam II*), 845 A.2d 1040, 1049 (Del. 2004).

When conducting a demand futility analysis, a Delaware court proceeds on a claim-by-claim and director-by-director basis.[3] As to each claim, the court asks for each director,

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;

---

[3] *See, e.g.*, *Khanna v. McMinn*, 2006 WL 1388744, at *14 (Del. Ch. May 9, 2006) ("This analysis is fact-intensive and proceeds director-by-director and transaction-by-transaction."); *Beam v. Stewart* (*Beam I*), 833 A.2d 961, 977 n.48 (Del. Ch. 2003) ("Demand futility analysis is conducted on a claim-by-claim basis."), *aff'd*, 845 A.2d 1040 (Del. 2004).

(ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and

(iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

*Zuckerberg II*, 262 A.3d at 1059. "If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile" for purposes of that claim. *Id.* Although the inquiries are framed as if they contemplate affirmative findings, each must be answered using the pleading-stage standard. *See id.* at 1049.

The board of directors that would consider a demand (the "Demand Board") comprises nine directors: Bhutani, Robel, Sharples, Garrett, Donahue, Roslansky, Sweet Wittlinger, and Chen. To establish demand futility, the plaintiff must plead facts supporting a reasonable inference that at least five members of the Demand Board could not act disinterestedly or independently on a demand.

Two of the directors are readily disqualified. Wittlinger was a dual fiduciary for the Company and Silver Lake, a party interested in the TRA Buyout, so he is not independent. Chen is both interested in the TRA Buyout as a recipient of payments under the TRA Agreements and has sufficiently longstanding and recent ties to KKR, a party interested in the TRA Buyout, to render him not independent. Framed in the language of the operative test, there is reason to doubt that either could consider a demand.

30

For the remaining directors, the plaintiff argues that each faces a substantial likelihood of liability for breaching their fiduciary duties when voting to approve the TRA Buyout.

Analyzing that contention requires determining the standard of review that would apply to a challenge to the TRA Buyout. If the business judgment rule would govern the challenge, then the Voting Directors will not face a substantial risk of liability and the complaint must be dismissed. If grounds exist to rebut the business judgment rule such that entire fairness would apply, then the Voting Directors could face a substantial risk of liability. At that point, the analysis must consider whether the plaintiff has pled facts sufficient to support an inference that the Voting Directors would not be entitled to exculpation. If the pled facts do not support such an inference, then the Voting Directors will not face a substantial threat of liability and the complaint again must be dismissed. But if it is inferable that the Voting Directors would not be entitled to exculpation then a substantial threat of liability exists, and the Rule 23.1 motion must be denied.

The plaintiff relies on a single theory to elevate the standard of review and negate exculpation. The plaintiff argues that the complaint's allegations support a reasonable inference that the Voting Directors acted in bad faith. That contention, if correct, rebuts one of the presumptions of the business judgment rule, causing the standard of review to

31

shift to entire fairness.[4] It also renders exculpation unavailable, because Delaware law does not permit a director to be exculpated for bad faith conduct. *See* 8 *Del. C.* § 102(b)(7). Successfully pleading bad faith thus leads to a pleading-stage inference that a director could not consider a demand. *United Food & Com. Workers Union v. Zuckerberg* (*Zuckerberg I*), 250 A.3d 862, 890 (Del. Ch. 2020) ("As part of [the demand futility] analysis, this decision considers whether the complaint pleads particularized facts that support a reasonable inference that the director's decision could be attributed to bad faith."), *aff'd*, 262 A.3d 1034, (Del. 2021).

## A.    The Standard For Pleading Bad Faith

Bad faith is a state of mind. Court of Chancery Rule 9(b) states that a person's "condition of mind may be averred generally." Ct. Ch. R. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally."). As noted previously, Court of Chancery Rule 23.1 requires that a plaintiff "allege with particularity the efforts, if any, made by the plaintiff to obtain the

---

[4] *In re Walt Disney Co. Deriv. Litig.* (*Disney II*), 906 A.2d 27, 53 (Del. 2006) (explaining that Delaware law "clearly permits a judicial assessment of director good faith" and that the business judgment rule can be rebutted by establishing "the directors breached their fiduciary duty of care or of loyalty or acted in bad faith" such that "[i]f that is shown, the burden then shifts to the director defendants to demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders."); *accord Brehm*, 746 A.2d at 264 n.66; *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 363 (Del. 1993); *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 40 (Del. Ch. 2010).

action the plaintiff desires from the directors or comparable authority and the reasons for

the plaintiff's failure to obtain the action or for not making the effort." Ct. Ch. R. 23.1(a).

Delaware decisions have read those rules together to require that a plaintiff plead

particularized facts that can support a reasonable inference about the directors' state of

mind.[5] In a legal regime that uses demand futility as a screening mechanism for weak

complaints, that approach makes sense, because permitting a plaintiff to rely on general

averments to disqualify a director for demand futility purposes would risk making it too

easy to survive a Rule 23.1 motion.[6]

---

[5] *Zuckerberg I*, 250 A.3d at 890 (surveying prior case law and concluding that as part of the demand futility analysis, a court "considers whether the complaint pleads particularized facts that support a reasonable inference that the director's decision could be attributed to bad faith."); *see Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) (requiring pleading of "particularized facts" to establish "bad faith"); *Rich v. Chong*, 66 A.3d 963, 966 (Del. Ch. 2013) ("Having found that the Plaintiff has pled particularized facts that raise a reasonable doubt that the directors acted in good faith in response to the demand, I deny the Rule 23.1 Motion."); *In re The Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, at *12 (Del. Ch. Oct. 12, 2011) (requiring that to establish demand futility, the plaintiffs had to plead facts "amounting to bad faith"); *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 824 (Del. Ch. 2005) (requiring "particularized facts sufficient to raise . . . a reason to doubt that the action as taken honestly and in good faith"), *aff'd*, 906 A.2d 766 (Del. 2006); *Guttman v. Huang*, 823 A.2d 492, 501–02, 507 (Del. Ch. 2003) (same); *see also In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 652 (Del. Ch. 2008) (holding to establish demand futility, a plaintiff must "plead particularized facts supporting an inference that the directors committed a breach of the fiduciary duty of loyalty").

[6] *See Zuckerberg II*, 262 A.3d at 1049; *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1054 (Del. Ch. 1996). The screening function is the only coherent explanation for the demand requirement. As Chancellor McCormick has explained, the notion that requiring demand encourages intra-corporate dispute resolution conflicts with how demand law operates. *See Solak v. Welch*, 2019 WL 5588877, at *7 n.62 (Del. Ch. Oct. 30, 2019) ("[T]he tacit concession doctrine set forth in *Spiegel*, coupled with the mutually exclusive

An individual's mental state is not directly observable. "[I]t may be virtually impossible for a . . . plaintiff to sufficiently and adequately describe the defendant's state of mind at the pleadings stage." *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 (Del.1993) (citations omitted). "Even after a trial, a judge may need to make credibility determinations about a defendant's subjective beliefs by weighing witness testimony against objective facts." *Allen v. Encore Energy P'rs, L.P.* (*Encore I*), 72 A.3d 93, 106 (Del. 2013). And even then, the members of the Court of Chancery "cannot peer into the hearts and souls of directors to determine their subjective intent with certainty." *Id.* (cleaned up). "Without the ability to read minds, a trial judge only can infer a party's subjective intent from external indications. Objective facts remain logically and legally relevant to the extent they permit an inference that a defendant lacked the necessary subjective belief." *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 178 (Del. Ch. 2014).

One of the objective indicia that a trial court can consider is how extreme the decision appears to be. As the Delaware Supreme Court has explained, if the pled facts indicate that that the terms of the transaction were extreme, then those facts are "logically

---

nature of a stockholder's options under Rule 23.1, discourages a stockholder from bringing potential wrongdoing to the corporation's attention prior to initiating litigation. This disincentive stands in tension with statements repeated in Delaware case law describing that Rule 23.1 serves to encourage stockholders to pursue pre-suit intracorporate remedies."), *aff'd*, 228 A.3d 690 (Del. 2020).

relevant" to making a subjective determination of bad faith. *Encore I*, 72 A.3d at 107. The

high court made its position on this issue clear because this court had posited that the

quality of the decision was "not relevant" when determining a party's good faith. *Id.* The

Delaware Supreme Court emphasized that such an assertion "overstated the potency of the

subjective good faith standard" and could render transactions "virtually unchallengeable."[7]

For a court to consider whether a decision appears extreme when assessing bad faith

accords not only with *Encore I*, but also with widely accepted scientific learning about the

theory of mind.

> While "mind reading" might sound like a mentalist magic trick, for cognitive
> scientists it refers to the very pedestrian capacity we all have for figuring out
> what another human being is thinking … Other people's minds are opaque
> to us, so we cannot observe them directly. And yet, when someone walks
> toward the water fountain on a hot day, we know she wants a drink. When
> someone yelps after stubbing her toe, we know she feels pain. When
> someone aims an arrow at a target, we know she intends to hit it. We take in
> observable data about a person and infer something about her unobservable
> mental life.

---

[7] *Encore I*, 72 A.3d at 106–07. Both *Encore I* and *El Paso* interpreted limited partnership agreements that eliminated fiduciary duties but required that a member of the board of directors of a corporate general partner make a decision in subjective good faith. The requirement of good faith that is a condition to compliance with the duty of loyalty under corporate law also requires subjective good faith. *Stone v. Ritter*, 911 A.2d 362, 369 (Del. 2006). The subjective requirement is thus identical, even though the object of the subjective belief can be different. For example, the corporate standard requires that the fiduciary believe subjectively that the decision will serve the best interests of the corporation and its residual claimants. *See El Paso*, 113 A.3d at 179–80. In an alternative entity agreement, a contractual standard may use a different referent, such as requiring that the decisionmaker believe subjectively that the decision will serve the best interests of the partnership, taking into account all of its stakeholders. *Id.* at 181.

Mihailis Diamantis, *How To Read a Corporation's Mind*, *in The Culpable Corporate Mind* 222–23 (Elise Bant ed., 2023) (footnotes omitted). Clairvoyance plays no role. "We gather two types of observable information—what the person did and the circumstances in which he did it—and triangulate to a person's unobservable mental state." *Id.* (footnote omitted).

The extent to which a business decision appears extreme under the circumstances is thus necessarily a factor that a court can consider when assessing mental state. That reality must not be confused with a seemingly similar proposition: the outcome of the challenged decision cannot itself be an occasion for director liability. The latter proposition "is the hard core of the business judgment doctrine." *Gagliardi*, 683 A.2d at 1051.

What actually happens down the road is a different issue than whether the decision appears extreme when made. Inferring bad faith because a decision turned out badly would impose liability by hindsight. Examining the circumstances surrounding the decision when made—irrespective of how it actually turns out—is part of how a court assesses mental state. If it appears that the transaction was "authorized for some purpose *other than* a genuine attempt to advance corporate welfare or *is known to constitute* a violation of positive law," then a court can find bad faith.[8] The decision may well have turned out

---

[8] *Id.* at 1051 n.2; *see In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996) ("That is, whether a judge or jury considering the matter after the fact, believes a decision substantively wrong, or degrees of wrong extending through 'stupid' to 'egregious' or 'irrational', provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in a good faith effort to advance corporate interests.").

36

badly—after all, there is a lawsuit—but the analytical lens focuses on the decision, not the outcome.

Indeed, in situations when there are no other pled facts that could provide any reasonably conceivable basis to infer that a fiduciary could have acted for an improper purpose, the court can *only* evaluate the merits of the decision that the fiduciaries made. *In re J.P. Stevens & Co., Inc. S'holders Litig.*, 542 A.2d 770, 780–81 (Del. Ch. 1988) ("A court may, however, review the substance of a business decision made by an *apparently* well motivated board for the limited purpose of assessing whether that decision is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.") (internal citation omitted)). If the decision is sufficiently extreme, then the court can still infer bad faith, but the decision must be so extreme that it could not be rationally explained on another basis. *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 34 (Del. Ch. 2014).

That means of pleading bad faith matches the standard for a claim for waste, defined as a decision "so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests." *White v. Panic*, 783 A.2d 543, 554 n.36 (Del. 2001). Although waste historically was viewed as a type of *ultra vires* act that was beyond a fiduciary's power to take, contemporary Delaware authorities have integrated the concept into the business judgment rule as a means of pleading bad faith. *See In re McDonald's Corp. S'holder Derivative Litig*., 291 A.3d 652, 693–94 (Del. Ch. 2023) (collecting cases).

37

Pleading that a transaction is so extreme as to suggest waste is thus one way to plead bad faith, but not the only way. *Id.* "While every act of waste supports an inference of bad faith, every act committed in bad faith does not necessarily constitute waste." *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *42 (Del. Ch. Apr. 14, 2017). There are ways to plead bad faith beyond alleging a transaction is so egregious that no business person of ordinary, sound judgment could approve it unless acting in bad faith. The Delaware Supreme Court took pains to emphasize that point when reviewing a decision in which this court had suggested that a plaintiff must always plead facts sufficient to exclude possibilities other than bad faith. Despite otherwise affirming this court's decision, the high court rejected that proposition, stating "to the extent that the Court of Chancery's decision might be read as suggesting that a plaintiff in this context must plead facts that rule out any possibility other than bad faith, rather than just pleading facts that support a rational inference of bad faith, we disagree with that statement as well." *Kahn v. Stern*, 183 A.3d 715, 2018 WL 1341719, at *1 (Del. 2018) (TABLE).

One other way that a plaintiff can plead bad faith is by alleging facts which support an inference that the defendant "acted with scienter, meaning they had actual or constructive knowledge that their conduct was legally improper." *McElrath v. Kalanick*, 224 A.3d 982, 991 (Del. 2020) (cleaned up). The necessary mental state can range from an

38

"intentional dereliction of duty," such as a "conscious disregard for one's responsibilities"[9] to an intent to act "with a purpose other than that of advancing the best interests of the corporation,"[10] to an "actual intent to do harm" to the corporation or its stockholders.[11]

The most difficult cases in corporate law involve the middle subset of possibilities. In that subset, the defendants have seemingly taken the steps necessary to comply with their duties, so an inference of bad faith does not arise from intentional dereliction of duty, such as a conscious disregard for one's responsibilities. The defendants also have not acted with malicious intent to harm the corporation and the stockholders. Nevertheless, in that subset of cases, there are indications that the directors acted with a purpose other than that of advancing the best interests of the corporation and its stockholders. In that setting, it is possible that directors can be found to have acted in bad faith if a purpose other than pursuing the best interests of the corporation and its stockholders tainted their actions. "It

_____

[9] *Disney II*, 906 A.2d at 66; *accord Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 240 (Del. 2009).

[10] *Disney II*, 906 A.2d at 67; *accord Stone*, 911 A.2d at 369 ("A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation . . . ."); *see Gagliardi*, 683 A.2d at 1051 n.2 (Allen, C.) (defining a "bad faith" transaction as one "that is authorized for some purpose *other than* a genuine attempt to advance corporate welfare or is *known to constitute* a violation of applicable positive law"); *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (Allen, C.) (explaining that the business judgment rule would not protect "a fiduciary who could be shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests").

[11] *Disney II*, 906 A.2d at 64; *accord Lyondell*, 970 A.2d at 240.

makes no difference the reason why the director intentionally fails to pursue the best interests of the corporation."[12] Bad faith can be the result of "any human emotion [that] may cause a director to [intentionally] place his own interests, preferences or appetites before the welfare of the corporation," including greed, "hatred, lust, envy, revenge, . . . shame or pride."[13]

Because of the need to draw inferences about a defendant's mental state from the surrounding circumstances and other indirect sources of evidence, bad faith functions as a residual catchall. At the pleading stage, the test is whether the complaint alleges a constellation of particularized facts which, when viewed holistically, support a reasonably conceivable inference that an improper purpose sufficiently infected a director's decision to such a degree that the director could be found to have acted in bad faith. Everything goes into that mulligan stew. The court must sample the concoction, and if the pleading-stage flavor is foul, then the complaint survives dismissal, and the case proceeds to discovery.

---

[12] *In re Walt Disney Co. Deriv. Litig.* (*Disney I*), 907 A.2d 693, 754 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006); *see Nagy v. Bistricer*, 770 A.2d 43, 48 n.2 (Del. Ch. 2000) ("[R]egardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes," even if for a reason "other than personal pecuniary interest.").

[13] *RJR Nabisco*, 1989 WL 7036, at *15; *see Guttman*, 823 A.2d at 506 n.34 ("The reason for the disloyalty (the faithlessness) is irrelevant, the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious action not in the corporation's best interest does not make it faithful, as opposed to faithless.").

Through this mechanism, Delaware's application of the business judgment rule remains true to that doctrine's origins as an inquiry into the good faith exercise of delegated power. In a scholarly and meticulous treatise, Professor David Kershaw has explained that what we describe today as the "business judgment rule" did not emerge as a concept until the 1940s and did not achieve prevalence until the 1970s. But the principle of deference to a good faith judgment made by an individual to whom authority has been delegated dates back to the eighteenth century. David Kershaw, *The Foundations of Anglo-American Corporate Fiduciary Law* 75 (2018). When assessing whether the individual exercised judgment in good faith, courts have always looked for "for evidentiary inferences or indicators, such as "circumstantial evidence of irrelevant preferences or conflicts of interest," "evidence of extreme indifference to the consequences of action," and an action that seems extreme based on some minimal level of "objective testing of the quality of the reasons" offered for it." *Id.* at 30 (citation omitted). *See generally id.* at 31–47.

When American judges began reviewing decisions by directors, they relied on the precedents about delegated authority and examined whether the directors had acted in good faith.[14] Decades later, when courts began referring to the "business judgment rule," the test

---

[14] *See id.* at 68-70. A trio of decisions that the New Jersey Court of Chancery issued in the 1890s illustrate this approach. *See id.* at 70-72 (discussing *Elkins v. The Camden & Atlantic Ry Co.*, 36 N.J. Eq. 9 (1882); *Ellerman v. Chicago Junction Rys*, 49 N.J. Eq. 217 (1891), and *Wildes v. Rural Homestead Co.*, 53 N.J. Eq. 452 (1895)). The New Jersey decisions warrant particular attention because when a certain upstart across the Delaware River sought to challenge New Jersey for the business of chartering corporations, that state both copied the New Jersey General Corporation Law (while making some provisions less

still turned on "'good faith and the exercise of honest judgment.'" Kershaw, *supra*, at 75

(quoting *Blaustein v. Pan Am. Petroleum*, 293 N.Y. 281, 303 (1944)). Early Delaware cases

deployed the following analytical framework:

> (i) directors owe obligations to exercise powers honestly and in good faith to further the corporate interest;
>
> (ii) there is no scope to review business decisions in the absence of dishonesty or bad faith;
>
> (iii) in the absence of clear evidence of improper intent or clear evidence of disregard of the corporate interest, good faith is typically testified by the existence of plausible or rational reasons for actions which need not be proved to be the actual reasons for actions; and
>
> (iv) the absence of such rational grounds—or even though they are present where other factors operate as proxies for bad faith such as extreme informational inadequacy—results in a finding of bad faith.[15]

---

restrictive and charging a lower price for incorporations) and treated New Jersey precedents as persuasive. *See, e.g.*, *Martin v. Am. Potash & Chem. Corp.*, 92 A.2d 295, 300 (Del. 1952) ("Our courts have long recognized that our General Corporation Law of 1899 was modeled after the then existing New Jersey act and decisions of the courts of that state are persuasive in construing a section of our statute drawn from the New Jersey law.") (citation omitted).

[15] *Id.* at 88 (formatting added). To support this framework, Professor Kershaw references *Bryan v. Aikin*, 82 A. 817 (Del. Ch. 1912) (Curtis, C.), *rev'd on other grounds*, 86 A. 674 (Del. 1913); *Lofland v. Cahall*, 118 A. 1 (Del. 1922); *Allied Chemical v. Steel & Tube Co.*, 122 A. 142 (Del. Ch. 1923) (Wolcott, C.); *Robinson v. Pittsburgh Oil Refin. Corp.*, 126 A. 46 (Del. Ch. 1924) (Wolcott, C.); *Bodell v. General & Electric Corp.*, 140 A. 264 (Del. 1927) (Wolcott, C.); *Davis v. Lousiville*, 142 A. 654 (Del. Ch. 1928) (Wolcott, C.); *Allaun v. Consol. Oil Co.*, 147 A. 257 (Del. Ch. 1929) (Wolcott, C.); *Eshelman v. Keenan*, 194 A. 40 (Del. Ch. 1937), *aff'd*, 2 A.2d 904 (Del. 1938); *Gottlieb v. Heyden Chemical. Corp.*, 90 A.2d 660 (Del. 1952); *Beard v. Elster*, 160 A.2d 731 (Del. 1960); *Nadler v. Bethlehem Steel*, 154 A.2d 146 (Del. Ch. 1959); *Maldonado v. Flynn*, 413 A.2d

Good faith thus was not simply an aspect of the business judgment rule; it was the whole of the rule. *Id.* at 97 ("[T]raditionally a rational business purpose was a proxy for demonstrating good faith, and the good faith requirement *was* the business judgment rule.) Chief Justice Strine and his co-authors have likewise located good faith at the center of Delaware's fiduciary jurisprudence. Leo E. Strine, *et al.*, *Loyalty's Core Demand: The Defining Role of Good Faith In Corporation Law*, 98 Geo. L. J. 629 (2010).

In *Aronson*, the Delaware Supreme Court reframed the business judgment rule more formally as "[a] presumption that in making a business decision the directors the corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation." 473 A.2d at 812. Unless one of those presumptions is rebutted, then "[a]bsent an abuse of discretion, that judgment will be respected by the courts." *Id.* As Professor Kershaw explains, that phrasing could be read to suggest that that "good faith" means something separate and distinct from "act[ing] on an informed basis," having an "honest belief that the action taken was in the best interests of the corporation," or taking action that was not "an abuse of discretion." Kershaw, *supra*, at 97. And because *Aronson* separately stated that if a board decision is "not approved by a majority consisting of disinterested directors, then the business judgment rule has no

121 (Del. Ch. 1980), *rev'd on other grounds* 430 A.2d 779 (Del. 1981). *See generally* Kershaw, *supra*, at 77–81.

43

application," 473 A.2d at 812, *Aronson's* framing could be read to imply that disinterestedness (and its close cousin independence) was yet another distinct inquiry.

If *Aronson* is approached from this standpoint, then each analytical step seems exclusive and subtractive. The court first looks to see if the allegations disqualify at least half of the directors by establishing reason to doubt their disinterestedness or independence. If so, then the business judgment rule is rebutted and the inquiry ends. If not, then the court gives no further consideration to allegations pertinent to disinterestedness and independence and only concerns itself with the allegations that are left.

Next, the court looks to see if the directors acted with due care, focusing exclusively on the allegations about the process that the directors followed. If those allegations support an inference of gross negligence, then the business judgment rule is rebutted and the inquiry ends. If not, then the court gives no further consideration to any allegations that pertinent to care. The court only examines what is left.

At this point, the court ostensibly considers allegations about whether the directors acted in good faith, but that inquiry has been denuded of content, both because loyalty and care already have been covered, and because in the final step under *Aronson*, after the presumptions of the business judgment rule have been considered, the court to defer to the board's judgment "[a]bsent an abuse of discretion." 473 A.2d at 812. With the inquiry limited in this fashion, good faith becomes a mystery. This method of reasoning effectively predetermines that no grounds will exist to question the defendants' good faith.

44

Although they do not say so expressly, the defendants approach this case using the foregoing framework. Their arguments, particularly in their reply brief, tick through a checklist. The defendants start with loyalty and examine whether the Voting Directors were interested in the TRA Buyout or independent of the Founding Investors. They need not consider due care, because the plaintiff does not assert a due care violation. Instead, they turn to whether the TRA Buyout could be attributed to a rational business purpose. *See* Defs.' Reply Br. 6–8. At that point, their version of the inquiry ends. Nothing is left over for good faith. It becomes a residual category, devoid of content and with no work to do.

That approach is misguided. Delaware law does not reduce good faith to such an emaciated role. Nothing about *Aronson* leads to a subtractive analysis in which good faith concerns itself only with residual leavings. It makes sense that *Aronson* would call for a court to look for and identify early in the analysis situations where business judgment deference cannot apply, such as where the board lacks a disinterested and independent majority. That type of upfront triage does not mean that an inquiry into good faith cannot consider the totality of the circumstances. The good faith inquiry can consider, for example, indications of interestedness that are not disqualifying in themselves but which nevertheless color the actions that the board took. By the same token, the fact that authorities generally call on a court to consider each director individually does not mean that a court cannot consider the directors' connections as a whole as part of the circumstances attendant to the board's decision. Directors make decisions collectively, so the collective circumstances are relevant.

45

Properly understood, the good faith inquiry is a holistic one. It requires a collective assessment of the complaint's allegations. In this way, good faith operates as a backstop that prevents the demand futility test from devolving into the type of checklist that the defendants try to deploy. Instead, good faith provides as a safety valve against an inappropriate pleading-stage dismissal when the allegations as a whole suggest inequitable conduct. A court of equity can allow a case to proceed past the pleading stage when the allegations as a whole support an inference of bad faith, even if the as-plead scenario does not fit within one of the easily demarcated boxes that *Aronson* identified for prioritized review.

**B.      The Question Of Good Faith In This Case**

Viewed holistically, the complaint's allegations provide reason to doubt that the Voting Directors acted in good faith. The following constellation of factors leads to that inference.

**1.      The Extreme Disparity In Valuation**

The first indicative factor is the stark contrast between the valuation of $175.3 million for the TRA Liability in GoDaddy's audited financial statements and the $850 million payment in the TRA Buyout. The contrast between those figures is so glaring as to support a claim of waste and hence an inference of bad faith on that basis alone.

In making the determination that $175.3 million was an appropriate valuation for the TRA Liability, Winborne and his financial team had to assess whether it was probable—in the sense of more likely than not—that GoDaddy would use the Tax Asset.

46

In a November 2019 presentation to the Audit Committee, management represented that GoDaddy would not generate sufficient taxable income to use all of the Tax Asset. PX 1 at '150. Management thus acknowledged that the Nominal Liability based on the Tax Asset might have been approximately $1.8 billion, but the TRA Liability was only $175.3 million, precisely because GoDaddy would not be able to use all of the Tax Asset. The 2019 10-K said the same thing: "We have determined it is more-likely-than-not we will be unable to utilize all of our DTAs subject to the TRAs[.]" DX 5 at 49.

The TRA Liability was a real number, prepared by management, audited by Ernst & Young, and signed off on by the Audit Committee. It received special focus as one of just two critical audit matters. Yet in the face of that real number, the Voting Directors approved the Company paying $850 million in the TRA Buyout.

Given the gulf between $175.3 million and $850 million, one might expect the record to contain documents addressing in detail why the numbers differed so dramatically. The documents that the complaint incorporates by reference do not contain any explanation of that sort. They show that when developing valuations for purpose of the TRA Buyout, Winborne and his team simply projected that GoDaddy would use the entire Tax Asset. There was no effort to engage with the more-likely-than-not determination or to bridge from one number to another.

The defendants respond that the 2019 10-K and the Company's audited financial statements also refer to the Nominal Liability. That is true: The Nominal Liability provides the starting point for calculating the TRA Liability. The audited financial statements bridge

47

from the latter to the former by assessing whether it is more likely than not that the Company will generate sufficient taxable income to utilize the Nominal Liability, which is the real driver of what the Company will owe to the Founding Investors. The presence of references to the Nominal Liability does not undermine the calculation of the TRA Liability. The fact that the 2019 10-K and the Company's audited financial statements acknowledge both figures makes it all the more glaring that the analyses for the TRA Buyout only consider the Nominal Liability and never engage with the TRA Liability.

The defendants' other response is to wave their hands and say that everyone knows accounting isn't valuation. Therefore, they say, management and the directors had the discretion to ignore the TRA Liability and derive their own valuation using different analyses. While there are times when an accounting entry diverges from fair value, most notably when an entry uses cost-based accounting or when an asset has been depreciated using a schedule that does not reflect real-world wear and tear, acknowledging that fact does not entitle the defendants to a pleading-stage inference that audited financial statements are generally unreliable. Nor does it entitle the defendants to a pleading-stage inference that the TRA Liability can be disregarded.

The pleading-stage record does not suggest that the TRA Liability is some obviously stilted figure. Winborne and his team prepared it with care, under the auspices of both Ernst & Young and the Audit Committee. At this stage of the case, the plaintiff is entitled to an inference that the Voting Directors approved the Company paying $850 million for something the Voting Directors knew was worth $175.3 million. That valuation disparity

48

is sufficient to suggest bad faith. Indeed, such an exchange "is so one-sided that no businessperson of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *Brehm*, 746 A.2d at 263.

Plaintiff thus pleads facts sufficient to support a claim of waste. That alone establishes an inference of bad faith sufficient to render demand futile. But the plaintiff has plead more, and there are additional factors which bolster the inference that the Voting Directors acted for an improper purpose.

### 2.    Winborne's Conflicting Representations

The second indicator of bad faith is the conflict between Winborne's representations to the Audit Committee and Ernst & Young and his representations to the Special Committee and the Voting Directors. When dealing with the Audit Committee and Ernst & Young for purposes of the TRA Liability, Winborne represented that it was more likely than not that GoDaddy would not generate enough taxable income to use all of the Tax Asset. When dealing with the Special Committee and the Voting Directors for purposes of the TRA Buyout, Winborne represented that GoDaddy would generate so much taxable income that it would use all of the Tax Asset. As framed, those assertions cannot be squared. For Winborne to have said one thing to the Audit Committee and Ernst & Young then said the opposite to the Special Committee and the Voting Directors supports an inference of bad faith.

A related consideration is the absence of any objections from Voting Directors who should have spoken up. Robel, Garrett, and Donahue served on the Audit Committee. CEO

Bhutani regularly attended their meetings. When Winborne was pursuing the TRA Buyout, they were contemporaneously going through a process with Ernst & Young to value the TRA Liability. That latter process resulted in the value of the TRA Liability being lowered in June 2020 from $175.3 million to $150 million. Robel, Garrett, and Donahue thus knew about Winborne's more-likely-than-not representation that formed the basis for valuating TRA Liability. Yet as members of the Special Committee, Robel and Garrett accepted Winborne's contrary representation and signed off on the TRA Buyout at over five times that amount. And when acting as a Voting Director, Donahue did the same. Nor are the remaining Voting Directors off the hook. Each of them signed the 2019 10-K that disclosed the TRA Liability, and each of them also signed off on the TRA Buyout.

At the pleading stage, the plaintiff is entitled to the inference that Winborne and the Voting Directors knew about the TRA Liability, believed it was accurate, but wanted to approve a deal that would make the Founding Investors happy. That plaintiff-friendly inference contributes to an inference of bad faith.

### 3. The Failure To Consider M&A

A third indicative factor is that that Winborne's projections and analysis excluded any consideration of GoDaddy's M&A-based business model and its effect on GoDaddy's ability to use the Tax Asset. One of the main reasons why GoDaddy had not made any payments under the Tax Agreements and kept putting off when they would begin was because the Company engaged in M&A.

50

The pleading-stage record demonstrates that M&A was part of the Company's business strategy. GoDaddy had engaged in transactions worth $2 billion during the four years preceding the TRA Buyout. Management told investors its 2020 investor day that it intended to "[e]xecute acquisitions to accelerate grown and technology and fill out our product roadmap." DX 6 at 80. Management announced a commitment to deploy 80% of its available capital over the next three years to M&A, representing approximately $4 billion in acquisitions. *Id.* That business plan would generate millions of dollars of additional tax assets that would delay GoDaddy's ability to use the Tax Asset.

As directors, the members of the Board and the Special Committee knew about GoDaddy's M&A-based business plan. The Special Committee even discussed it during their meeting on June 26, 2020, when they considered whether using cash for the TRA Buyout would interfere with GoDaddy's business strategy. They asked management on whether after completing the TRA Buyout, GoDaddy would have "sufficient funds to engage in certain additional strategic transactions over the next few years…." *Id.* at '180. Winborne said yes. But the projections that Winborne had prepared for the Special Committee and to support the TRA Buyout did not contemplate acquisitions.

The pleading-stage record supports an inference that the members of the Special Committee knew that Winborne's projections rested on unrealistic assumptions. During the Special Committee's second meeting on February 7, 2010—its first substantive meeting—Winborne walked through a presentation that included a base case financial model that projected the Company's free cash flow. DX 7 at '004; *id.* at '014. One of the

51

Committee members asked if the projections included growth initiatives, which inferably includes future acquisitions. Winborne said that the projections did *not* include those initiatives. *Id.*; *see id.* at '014.

Despite inferably knowing that the projections rested on the unrealistic and counterfactual assumption that GoDaddy would not make any more acquisitions, the directors went along. That suggests bad faith.

### 4. The Thirty-Minute Meeting

The next consideration includes factors which, if considered in isolation, would likely only support a potential breach of the duty of care, but which nevertheless contribute to an inference of bad faith as part of the holistic analysis. After the Special Committee declined to approve the TRA Buyout using its delegated authority, the Voting Directors gave it the thumbs up in a thirty-minute meeting, without a fairness opinion, without the firm who performed financial analysis of the TRA Buyout being present, and despite knowing that the valuation of the TRA Liability conflicted on its face with the pricing of the TRA Buyout.

The record does not contain any explanation as to why the Special Committee balked at approving the TRA Buyout when the moment finally came. The resolutions that originally created the Special Committee empowered the Committee to make the decision itself. To be sure, the resolution contemplated that its members might defer to the full Board and provide a recommendation, but the purpose of creating the Special Committee was to neutralize Board-level conflicts.

52

At the pleading-stage, it is reasonable to infer that the Special Committee realized that two of its members—Robel and Sharples—had ties to the Founding Investors that were compromising. Robel was co-investing with TCV, and Sharples had a longstanding relationship with the same firm. But int he meantime, Mondre had left the Board and Sweet had joined, so the numbers worked better at the Board level. The inferably compromised Special Committee that was responsible for the TRA Buyout therefore sent the decision upward.

Once the Special Committee took that step, the Voting Directors needed to dig in. The Board had created the Special Committee because "certain members of the Board and of management of the Company are affiliated with the holders of the TRAs or are party to the TRAs" and the Special Committee would "mitigate and address conflicts of interest in connection with the foregoing process and any transaction resulting therefrom." DX 3 at '455. Now, the Special Committee had tossed the decision back to the Board. If the Voting Directors were going to cleanse the transaction, they had to perform their role.

The Voting Directors did not dig in, and the Special Committee did not help them. As Chair of the Special Committee, Robel recommended that the Voting Directors approve the TRA Buyout. He and Garrett did not discuss the Audit Committee's contemporaneous process that resulted in the TRA Liability falling from $175.3 million to $150 million. None of the Special Committee members explained that the projections did not include future acquisitions.

53

The Voting Directors had enough knowledge on their own to question the TRA Buyout. Donahue was a member of the Audit Committee and had participated in the process of lowering the TRA Liability from $175.3 million to $150 million. The other Voting Directors had signed the 2019 10-K which valued the Tax Liability at $175.3 million and stated that GoDaddy probably would not use all of the Tax Asset. They inferably knew that the numbers did not add up.

At a minimum, the Voting Directors should have asked questions. Instead, they went along. The Voting Directors also should have questioned why the Special Committee had not obtained a fairness opinion and why KPMG was not at the Board meeting. Management was proposing to pay $850 million to resolve a liability that the Company had valued at $175.3 million as of December 31, 2019, and at $150 million the month before. Management was treating the transaction as the acquisition of an asset, but no one had obtained a fairness opinion, and the firm that provided a valuation report was nowhere to be found. The meeting was over in thirty minutes.

Issues like the failure to ask questions, the length of the meeting, or the failure to have an advisor present typically only would relate to the issue of care. Here, those factors do not stand alone. They combine with the directors' knowledge of the disparity between the value of the TRA Liability and the price to be paid in the TRA Buyout, and they operate in conjunction with other considerations. They therefore provide another ingredient for the mulligan stew and contribute to the inference of bad faith.

## 5. The Ties With The Founding Investors

The final consideration is that the TRA Buyout is not a transaction with a third party lacking any prior ties to the decisionmakers. It is a transaction with counterparties that management and the directors had reason to favor.

The four Founding Investors who would receive the bulk of the consideration were Parsons, the Company's founder, and three major private equity firms. They obviously carried considerable influence at the Company, at least before they liquidated their shares, and that influence would not have vanished overnight. The transaction process began only ten months after those Founding Investors completed their sales, at a point when Mondre, Wittlinger, and Chen remained on the Board.

The two principal players from management had close ties to the Founding Investors. Kelly, the General Counsel, started the transaction process by circulating the written consent that created the Special Committee. She was a Founding Investor in her own right and would benefit from a TRA Buyout. Winborne then took over. He had been an executive at KKR portfolio companies for eleven years, including approximately four years during which he worked for the Company. He created the projections that drove the analysis. He provided the information on which the directors relied. He negotiated with Silver Lake and KKR, and those negotiations happened to end up at the upper limit of his authority. He then pushed the Special Committee to approve the deal quickly. After the TRA Buyout was approved, both Kelly and Winborne left GoDaddy, with Kelly landing a

job at another KKR affiliate. There is a sense that two trusted lieutenants got the result they were expected to obtain.

Nor was the Special Committee pristine. Sharples has a history of successfully investing with TCV. Robel was a Founding Investor who only became qualified to serve on the Special Committee by renouncing his interest in the Tax Agreements. He contemporaneously received an invitation to co-invest with TCV in a company where the upside could constitute a material portion of his wealth.

There were other options. When Kelly drafted the resolution for the Committee, she named Robel as Chair and Sharples and Garrett as members. There were two other directors with minimal ties to the Founding Investors—Donahue and Roslanky—but Kelly did not identify either. That suggests that the Special Committee was designed to lean into, rather than avoid, entanglements with the Founding Investors.

Lateraling the decision to the Board did not cleanse the process. There were four apparently disinterested and independent directors: Garrett, Donahue, Roslansky, and Sweet. There were two plainly compromised directors: Wittlinger and Chen. There were two inferably compromised directors: Robel and Sharples. That turns the CEO—Bhutani— into the swing director. He came from a TCV backed company. Would he have the fortitude to stick his neck out on the TRA Buyout, particularly when the Compensation Committee that approved his pay package consisted of Chen, Sharples, and Sweet? A reasonable mind can doubt it.

56

This is not a situation where the collective weight of many disinterested and independent voices can easily outweigh a few directors with conflicts. This is a situation where smoke filled the boardroom, suggesting that the plaintiff should be permitted to conduct discovery to determine if there was any fire.

### 6. The Conclusion Regarding Demand Futility

This is a close case for pleading-stage analysis. The defendants' strongest argument relies on compartmentalizing the elements of the business judgment rule in a way that denudes good faith of substance. That approach conflicts with Delaware Supreme Court precedents like *Encore I* and abandons the role that good faith historically played. Compartmentalizing the analysis in this way would elevate the form of the demand futility standard over its substance. Courts of equity exist to address substance, as exemplified by the maxim that "equity regards substance rather than form." *Monroe Park v. Metro. Life Ins. Co.,* 457 A.2d 734, 737 (Del. 1983).

When viewed in a compartmentalized way, the complaint's allegations suggest that a majority of the Demand Board faces at most a claim for breach of the duty of care, which does not give rise to a substantial threat of liability due to the availability of exculpation. When viewed holistically, the complaint's allegations support an inference of bad faith: Two members of management (Kelly and Winborne) steered a process towards an outcome designed to favor the Founding Investors, aided by a Special Committee populated with the three outside directors most likely to sign off on the deal (Robel, Sharples, and Garrett). Skilled counsel scripted a process to maximize the chances of a pleading-stage dismissal,

57

but the litigation risk was too great, so the Special Committee tossed the issue back to the Board. At that point, everyone knew that the Company was paying $850 million to resolve a liability valued in the Company's public disclosures at $175.3 million, but the Voting Directors held their noses and approved the transaction. That was what the Founding Investors wanted. One of them was the founder of the Company without whom the Company would not have existed. The others were powerful private equity firms who knew how to reward helpful souls. They demonstrated that through the co-investment opportunity for Robel, the directorship for Sweet, and the job for Kelly. The price disparity alone is so glaring as to support a claim for waste.

At the pleading stage, the court does not decide between competing inferences. The plaintiff receives the benefit of the inference that favors its case. *See Zuckerberg II*, 262 A.3d at 1048. The complaint therefore pleads facts which, when read together, support an inference of bad faith and enable the case to survive pleading-stage review.

## C.     The Rule 12(b)(6) Analysis

The plaintiff asserted claims for breach of fiduciary against the directors, breach of fiduciary duty against Winborne, and waste. Winborne did not move to dismiss the claim against him under Rule 12(b)(6). The directors did.

"Delaware courts have recognized that the standard to be used to evaluate a Chancery Rule 12(b)(6) motion is less stringent than the standard applied when evaluating whether a pre-suit demand has been excused in a stockholder derivative suit filed pursuant to Chancery Rule 23.1." *Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 39 (Del. 1996).

58

"Since the standard under Rule 12(b)(6) is less stringent than the standard under Rule 23.1, a complaint that survives a Rule 23.1 motion to dismiss generally will also survive a Rule 12(b)(6) motion to dismiss, assuming that it otherwise contains sufficient facts to state a cognizable claim." *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 285 (Del. Ch. 2003); *see also In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 139 (Del. Ch. 2009).

For the same reasons stated in the demand futility analysis, the complaint contains well-plead factual allegations that state a claim against the Voting Directors for breaching their fiduciary duties when approving the TRA Buyout. The complaint also contains well-plead factual allegations that support a claim for waste.

## III.    CONCLUSION

The defendants' motions to dismiss under Rule 23.1 and Rule 12(b)(6) are denied.